IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PHARON J. VOEGELI,

                Plaintiff,

  v.

CITY OF JANESVILLE, COUNTY OF ROCK,
VINCENT LEMERY, SHAWN WELTE,
KEVIN SKATRUD, JAYSEN CLEASBY,
ERIN WILSON, DANIEL BANKS,
CHRISTOPHER SIMON, and JAMES SCHULER,

                Defendants.

OPINION and ORDER

20-cv-845-jdp

---

This case arises out of plaintiff Pharon Voegeli's arrest in 2019 for operating a vehicle while intoxicated. He alleges that police officers for the City of Janesville and correctional officers for Rock County forced him to submit to a blood draw without a warrant, in violation of the Fourth Amendment to the U.S. Constitution.

Voegeli moves for partial summary judgment against two defendants: Vincent Lemery, an officer for the Janesville Police Department who ordered the blood draw, and Kevin Skatrud, the Rock County jail sergeant. Dkt. 45. Defendants, in two groups, move for summary judgment on all claims. Dkt. 36 (by the City of Janesville and its employees, Lemery and Shawn Welte); Dkt. 25 (by Rock County and its employees, Kevin Skatrud, Jaysen Cleasby, Erin Wilson, Daniel Banks, Christopher Simon, and James Schuler).

Let's not mince words: Voegeli was a menace the night of his arrest. He had been previously arrested six times for driving while intoxicated. After officers stopped him, he ran from his car and resisted arrest when officers detained him. At the jail, he refused lawful orders and he continued aggressive resistance. But none of this matters to this case. Voegeli was at all

times protected by the Bill of Rights to the U.S. Constitution. The only questions that matter here is whether the blood draw violated the Fourth Amendment and whether each individual defendant may be held liable for any constitutional violation.

The court concludes that Lemery violated Voegeli's rights under the Fourth Amendment. Lemery says that Voegeli consented to the blood draw, but its undisputed that Voegeli was violently resisting officers' efforts to subdue him while preparing him for the procedure. No reasonable jury could find that the blood draw was consensual under those circumstances. Lemery had no other legal justification for the blood draw, so Voegeli is entitled to summary judgment against Lemery on the issue of liability.

The court reaches the same conclusion on Voegeli's claim against Skatrud, who Voegeli contends should have intervened to stop Lemery. The undisputed facts show that Skatrud had reason to know that the blood draw was unlawful, and he had a realistic opportunity to stop the blood draw but declined to do so. Officers in Skatrud's situation have a duty to intervene, so Voegeli is entitled to summary judgment against Skatrud on the issue of liability as well.

Neither Lemery nor Skatrud is entitled to qualified immunity. The law is well evolved in this area, and it is clearly established that law enforcement officers may not draw blood from an intoxicated driver without a warrant, consent, or another legal justification, none of which were present here.

The court will grant summary judgment to the remaining individual defendants. As for the Rock County correctional officers, Voegeli hasn't adduced evidence that any of them had reason to know that the blood draw was unlawful, so they had no duty to intervene. As for Welte, he neither directed nor participated in the unconstitutional blood draw, so he can't be held liable either.

UNDISPUTED FACTS

During the early morning hours of March 17, 2019, Voegeli was arrested on suspicion that he was driving while intoxicated in Janesville, Wisconsin. Officers took him to the Rock County jail and placed him in a holding cell. Defendant Vincent Lemery, an officer for the Janesville Police Department, read Voegeli the following statement:

> You have either been arrested for an offense that involves driving or operating a motor vehicle while under the influence of alcohol or drugs, or both, or you are the operator of a vehicle that was involved in an accident that caused the death of, great bodily harm to, or substantial bodily harm to a person, or you are suspected of driving or being on duty time with respect to a commercial motor vehicle after consuming an intoxicating beverage.
>
> This law enforcement agency now wants to test one or more samples of your breath, blood, or urine to determine the concentration of alcohol or drugs in your system. If any test shows more alcohol in your system than the law permits while driving, your operating privilege will be suspended. If you refuse to take any test that this agency requests, your operating privilege will be revoked and you will be subject to other penalties. The test results or the fact that you refused testing can be used against you in court.
>
> If you take all the requested tests, you may choose to take further tests. You may take the alternative test that this law enforcement agency provides free of charge. You also may have a test conducted by a qualified person of your choice at your expense. You, however, will have to make your own arrangements for that test.
>
> If you have a commercial driver license or were operating a commercial motor vehicle, other consequences may result from positive test results or from refusing testing, such as being placed out of service or disqualified.

Defendant Shawn Welte, another Janesville police officer, was also present.

Staff videotaped Voegeli's conversation with Lemery. Lemery asked Voegeli whether he consented to "an evidentiary chemical test of [his] blood." Voegeli first asked, "Does it matter?"

3

Lemery asked Voegeli several more times whether he consented to the test; Voegeli replied multiple times, "It doesn't matter." Welte told Voegeli that they would get a warrant if he refused. Vogeli then said, "Sure why not."

A few seconds later, Voegeli said "no." Lemery said to Welte, "He's saying no now, but he said yes, so—." Lemery then said to Voegeli, "I asked you yes or no." Voegeli said, "If I say no you're gonna take it, if I say yes, you're gonna take it." Lemery said, "That's right." Voegeli said, "Say yes, might look better in court." In response, Lemery marked on the form that Voegeli consented to a blood draw. At that point, the video ends.

Later, defendant Kevin Skatrud, the jail sergeant, asked Lemery and Welte about the status of the blood draw.[1] They told him that Voegeli had consented. Skatrud told them that officers could not hold Voegeli down for a consensual blood draw. Lemery and Welte told Skatrud that they believed there were also exigent circumstances because of the passage of time, so they would conduct the blood draw regardless of Voegeli's consent.

Defendant James Schuler, a Rock County jail correctional officer, escorted Voegeli to the medical intake room for a blood draw and placed him in a chair. Three other correctional officers were present: defendants Jaysen Cleasby, Daniel Banks, and Christopher Simon. Voegeli stood up and said, "No, I won't and I can't." At that point, Voegeli began "violently thrash[ing] around." Dkt. 60, ¶ 26.

Schuler called for help. Defendant Erin Wilson, a correctional supervisor, brought in a restraint chair. Voegeli continued resisting, "thrashing around, tensing his muscles, trying to

---

[1] The parties don't say in their proposed findings of fact how much time elapsed between Lemery marking the form and Skatrud speaking to Lemery and Welte. Skatrud says in his incident report that it was at least 30 minutes. Dkt. 32-1, at 9.

get away from the correctional officers." Dkt. 58, ¶ 91. In response, the officers moved Voegeli into the booking intake room. Except for Welte, all of the individual defendants were present.[2]

Cleasby and Banks attempted to place Voegeli in the restraint chair, but Voegeli attempted to pull away from them and braced his legs against the chair so they could not seat him. He kicked at the officers, moved his arms, and ignored Skatrud's orders to stop resisting. Dkt. 60, ¶ 35.

Skatrud warned Voegeli that he would be tased if he didn't stop resisting. When Voegeli continued to thrash around, Skatrud deployed a taser to Voegeli's collarbone area. That didn't stop Voegeli, so Skatrud deployed the taser to Voegeli's ankle. At that point, Voegeli stopped resisting. There is no video or audio of the use of force.

Officers placed Voegeli in the restraint chair. At that point, another video recording was started. Some officers held Voegeli in place, including by immobilizing his head, while other officers secured the restraints to his wrists, ankles, and shoulders. After Voegeli was fully restrained, a nurse proceeded with the blood draw—at Lemery's directive—while one of the correctional officers held Voegeli's arm in place. Voegeli did not verbally object or physically resist at that time.

None of the defendants obtained a warrant for drawing Voegeli's blood.

ANALYSIS

Before considering the merits of Voegeli's claims, the court notes several issues that aren't in dispute or aren't raised by the parties. First, Voegli's arrest in this case led to a

---

[2] The parties don't say when Welte left, but it's undisputed that he wasn't present when Voegeli was taken to the medical intake room or any time after that.

conviction for operating a vehicle while intoxicated, Dkt. 58, ¶¶ 114–15, but no party contends that the conviction bars Voegeli's claim. Under *Heck v. Humphrey*, the general rule is that a plaintiff may not bring a claim for a constitutional violation if success on the claim would necessarily imply that the plaintiff's conviction or sentence is invalid. 512 U.S. 477, 486–87 (1994). "Fourth Amendment claims as a group do not necessarily imply the invalidity of a criminal conviction," *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008), but even if this one did, a defense under *Heck* can be waived, *Polzin v. Gage*, 636 F.3d 834, 838 (7th Cir. 2011), so the court need not decide the issue. *See McShane v. Moldenhauer,* No. 20-C-717, 2021 WL 75684, at *2 (E.D. Wis. Jan. 8, 2021) (noting that claim challenging blood draw could be barred by *Heck* but considering the claim on the merits).

Second, no party contends that Voegeli's claim is precluded by a ruling in state court that already decided the validity of the blood draw. *See Allen v. McCurry*, 449 U.S. 90 (1980) (claim and issue preclusion can apply to a state court's Fourth Amendment rulings in the context of a criminal proceeding). Voegeli also doesn't contend that any favorable rulings he may have obtained from the state court are binding here. Issue preclusion can also be waived, *see Klingman v. Levinson*, 114 F.3d 620, 627 (7th Cir. 1997), so the court need not decide that issue either.

Third, Voegeli isn't challenging any of the defendants' use of force as excessive. His sole claim is that each of the defendants was personally involved in subjecting him to an unconstitutional blood draw.

Fourth, Voegeli isn't contending that the City of Janesville or Rock County violated his rights. Rather, Voegeli named the municipal defendants for the sole purpose of obtaining a declaration that they are required under Wis. Stat. § 895.46 to indemnify any individual

6

defendants who are employed by them and found liable. *See Holte v. City of Eau Claire*, No. 20-cv-131-jdp (W.D. Wis. July 15, 2021) (allowing municipal defendant to remain in the case for this purpose); *Estate of Smith by Bryfczynski v. Oneida Cty.*, No. 19-cv-972-wmc, 2021 WL 2188220, at *12 (W.D. Wis. May 28, 2021) (same); *but see Williams v. Michalsen,* No. 19-cv-56-pp, 2020 WL 1939136, at *9 (E.D. Wis. Apr. 21, 2020) ("If the individual officers are found liable, the indemnity mandated by § 895.46 will be triggered; the plaintiffs do not need to sue the county for that to happen. The plaintiffs may not name the county in the amended complaint unless they allege some wrongdoing by the county, as opposed to the individual defendants."). The court will keep the municipal defendants in the case, but there is no need to address them further in this opinion.

Fifth, the parties don't dispute some of the basic facts and legal principles that guide the decision in this case. Specifically, it's undisputed that the Fourth Amendment requires officers to obtain a warrant to conduct a blood draw, unless one of the exceptions to the warrant requirement applies. *See Missouri v. McNeely*, 569 U.S. 141, 151 (2013). It's also undisputed that exigent circumstances didn't justify the blood draw. "In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *Id*. at 145. The officers in this case could have obtained a warrant in about an hour, which was more than enough time to preserve evidence of Voegeli's blood-alcohol level. Dkt. 61, ¶¶ 56, 63–85.

Defendants raise three primary arguments in support of their contention that they didn't violate Voegeli's Fourth Amendment rights. First, all of the defendants contend that they reasonably believed that Voegeli had consented to the blood draw. *See Birchfield v. North*

7

*Dakota*, 136 S. Ct. 2160, 2185 (2016) ("[A] search is reasonable when the subject consents.). Second, the Rock County employees contend that they reasonably assumed that the Janesville officers had lawful authority to compel the blood draw. Third, all defendants but Lemery contend that they weren't personally involved in the blood draw.

The court will first consider the parties' cross motions for summary judgment on Voegeli's claims against Lemery and Skatrud. The court will then consider defendants' summary judgment motions on the remaining claims.

## A. Vincent Lemery

Lemery is the Janesville police officer who ordered the blood draw. For the purpose of his motion for partial summary judgment, Voegeli assumes that he initially gave his voluntary consent to the blood draw when he said, "Say yes, might look better in court." He also assumes that Lemery didn't hear him verbally revoke his consent, as Lemery alleges. Despite these assumptions, Voegeli contends that he is entitled to summary judgment against Lemery because the undisputed facts make it clear that he revoked his consent through his actions.

A suspect who initially gives his voluntary consent may later withdraw it through "an unequivocal act or statement." *United States v. $304,980.00 in U.S. Currency*, 732 F.3d 812, 820 (7th Cir. 2013). *See also United States v. Mitchell*, 82 F.3d 146, 151 (7th Cir. 1996) ("Consent to search may, of course, be withdrawn or limited by a criminal suspect."). Like most tests under the Fourth Amendment, this is an objective inquiry, viewed from the perspective of a reasonable person observing the suspect's conduct. *See United States v. Williams,* 898 F.3d 323, 331 (3d Cir. 2018).

In this case, Voegeli says that he unequivocally withdrew his consent by physically resisting the blood draw. Most of that resistance wasn't recorded, but the facts are undisputed.

Immediately after stating, "No, I won't and I can't," Voegeli began "violently thrash[ing] around." Dkt. 60, ¶ 26. He tried get away from the officers, kicked at them, and ignored numerous orders to stop resisting. He had to be tased *twice* before he began cooperating. At that point, multiple officers placed restraints on Voegeli's wrists, ankles and shoulders while also physically holding him down. One officer held Voegeli's arm in place as the nurse conducted the blood draw.

It is hard to imagine an act that more unequivocally communicates lack of consent than violent resistance. Other courts have held that less dramatic displays than Voegeli's qualified as unequivocal withdrawal of consent. *See United States v. Sanders,* 424 F.3d 768, 775 (8th Cir. 2005) (suspect unequivocally withdrew consent by "mov[ing] his hands down and prevent[ing] [the officer] from searching his pockets"); *Fair v. Mills*, 230 F. Supp. 3d 1305, 1312–13 (M.D. Fla. 2017) (suspect unequivocally withdrew consent "when he dropped his hands to his waist two times in an effort to stop the search" of his waistband). The general standard from these and other courts is that a suspect unequivocally withdraws consent through conduct if the conduct prevents officers from completing the search. *See United States v. Terry,* 220 Fed. Appx. 961, 963 (11th Cir. 2007) (suspect closed the trunk of the car that officers wanted to search); *Sanders*, 424 F.3d at 776–77 ("Sanders prevented [the officer] from completing the search at least five times."); *Fair*, 230 F. Supp. 3d at 1312–13 (suspect had to be handcuffed to continue with search); *United States v. Ibarra*, 731 F. Supp. 1037, 1039 (D. Wyo.1990) (suspect closed and locked car trunk that officers wanted to search); *Jimenez v. State,* 643 So.2d 70, 72 (Fla. Ct. App. 1994) (suspect grabbed officer's hands when he tried to search a pack of cigarettes).

That standard is easily met in this case. The nurse was unable to conduct the blood draw until multiple officers held Voegeli down and fully restrained him. Regardless of whether

9

Lemery heard Voegeli say "no," it would have been clear to any reasonable officer that Voegeli had withdrawn consent. No reasonable jury could reach a different conclusion on these undisputed facts.

Lemery says that officers used force on Voegeli "for the safety of all concerned" rather than to force Voegeli to submit to the blood draw. Dkt. 49, at 2. But that argument misses the point. Voegeli isn't challenging the validity of the use of force or questioning his need to be restrained. And the officers' motive for restraining Voegeli is simply irrelevant. The question isn't why the officers restrained Voegeli but whether Voegeli's resistance made it clear that he was withdrawing consent. Voegeli began resisting immediately after he was brought into the medical intake room to conduct the blood draw. Lemery identifies no way to interpret Voegeli's conduct other than as unequivocal acts communicating his objection to the blood draw.

It is true that Voegeli didn't object or struggle at the very moment that the nurse conducted the blood draw. But by that point, Voegeli had already made his objection clear, so he didn't need to continue pressing the issue. If Lemery wanted to conduct the blood draw after Voegeli calmed down, he needed to obtain Voegeli's consent again or obtain a warrant.

Lemery raises a qualified immunity defense, which applies to a public defendant's conduct that does not violate clearly established law. *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Lemery isn't entitled to qualified immunity because the relevant legal principles are clearly established. Specifically, at the time Lemery conducted the blood draw, the law was clear that Lemery could not conduct a blood draw without a warrant, unless one of the exceptions to the warrant requirement applied. *McNeely*, 569 U.S. at 151. The law was also clear that consent—the only exception Lemery relies on—can be withdrawn by an unequivocal act. *$304,980.00 in U.S. Currency*, 732 F.3d at 820.

10

Lemery says that he is entitled to qualified immunity because Voegeli hasn't cited any cases involving "a dangerously volatile and unpredictable OWI arrestee whose behavior was a threat to those around him at the time immediately prior to the search." Dkt. 49, at 6. But a plaintiff may overcome a qualified immunity defense even if there are no previous cases involving nearly identical facts, so long as the case law provided clear notice that the defendant's conduct violated the Constitution. *Vodak v. City of Chicago*, 639 F.3d 738, 746–47 (7th Cir. 2011); *Narducci v. Moore*, 572 F.3d 313, 322–23 (7th Cir. 2009). That standard is satisfied in this case because the facts that Lemery cites don't undermine the fact that Voegeli unequivocally withdrew his consent. Defendants had good reasons for restraining Voegeli besides drawing his blood. But none those reasons justify the nonconsensual blood draw.

The court will grant Voegeli's motion for partial summary judgment against Lemery and it will deny Lemery's motion for summary judgment. Voegeli's claim against Lemery will proceed to trial on damages.

**B. Kevin Skatrud**

Skatrud was the Rock County jail sergeant. He wasn't directly involved in the decision to conduct the blood draw, but Voegeli says that Skatrud can be held liable for failing to stop the blood draw from happening. A defendant may be held liable for failing to stop another officer's constitutional violation if the plaintiff shows two things: (1) the defendant "had reason to know" that the other officer was violating the plaintiff's constitutional rights; and (2) the defendant had a "realistic opportunity" to prevent the violation. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

The court is persuaded that Voegeli has satisfied both elements as a matter of law. As for whether Skatrud had reason to know that Voegeli was being subjected to an

11

unconstitutional blood draw, Skatrud knew from his discussion with Lemery that Lemery was relying on two justifications for the blood draw: exigent circumstances and consent. Dkt. 63, ¶¶ 41–44; Dkt. 32-1, at 9. And Skatrud had reason to know that neither exception to the warrant requirement applied. Skatrud testified that he knew that Voegeli would be intoxicated for at least three or four hours, Dkt. 63, ¶ 56, and he knew that a warrant could be obtained in about an hour, Dkt. 42 (Skatrud Dep. 46:22–47:01). Skatrud identifies no basis for a belief that Lemery didn't have time to obtain a warrant.

Skatrud also had reason to know that Voegeli had withdrawn any consent that he had previously given for the blood draw. Skatrud was in the room while Vogeli was resisting the officers. It was Skatrud who used a taser on Voegeli twice. So Skatrud had just as much reason to know as Lemery that the blood draw wasn't consensual. In fact, Skatrud had previously informed Lemery and Welte that they couldn't rely on consent if they needed to hold Voegeli down.

As for a realistic opportunity to prevent the constitutional violation, the video of the blood draw shows that more than a minute passed between the time Voegeli was fully restrained and the moment when the nurse conducted the blood draw. So Skatrud had enough time to intervene. And the nurse was under Skatrud's supervision, so she would have been required to comply if he told her to stop the blood draw. Dkt. 63, ¶ 87; Dkt. 42 (Skatrud Dep. 36:2–18).

Skatrud says in his brief that he wasn't involved in arresting Voegeli or investigating the crime, so he didn't have enough information to determine whether Lemery needed a warrant or could rely on consent or exigent circumstances. But Skatrud doesn't explain how knowledge of Voegeli's arrest or the details of the investigation are relevant. Voegeli has cited

12

undisputed evidence showing that Skatrud knew both that there was enough time to obtain a warrant and that Voegeli withdrew his consent to the blood draw. Skatrud doesn't point to any other facts that would support a belief that the blood draw was lawful.

Skatrud also says that he had no supervisory authority over Janesville police officers, so it would have been "extremely inappropriate" for him to interfere in their investigation. Dkt. 34, at 14. But Skarud cites no legal authority for that view. A failure-to-intervene claim is not limited to those with supervisory authority. *Yang*, 37 F.3d at 285 ("This responsibility to intervene applies equally to supervisory and nonsupervisory officers."). And it "is certainly not limited to the context of a police officer's relationship with other officers in her department." *Windle v. City of Marion, Ind.*, 321 F.3d 658, 663 (7th Cir. 2003). As Voegeli points out, the court of appeals has allowed failure-to-intervene claims to proceed even when the officers were employed by different agencies. *See Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (allowing failure-to-intervene claim to proceed against City of Madison police officers who failed to stop use of force by State Capitol officer).

The important question is whether the defendant had a realistic opportunity to intervene in some way, not whether the other officer is required to comply with the defendant's orders. Such a rule would be inconsistent with the view of the court of appeals that the duty to intervene may include "call[ing] for a backup," "call[ing] for help," or even simply "caution[ing] the . . . defendant to stop." *Id. See also Miller v. Gonzalez*, 761 F.3d 822, 826 (7th Cir. 2014) ("A 'realistic opportunity' means a chance to warn the officer using excessive force to stop."). In this case, even if Skatrud couldn't give orders to Lemery, he could have stopped the blood draw by directing the nurse—who *was* under Skatrud's supervision—to stop. That is sufficient to satisfy *Yang*.

There are no material disputes of fact on either element of the claim against Skatrud. No reasonable jury could find that Skatrud didn't have reason to know that Voegeli's rights were being violated or that Skatrud didn't have a realistic opportunity to intervene. And *Yang* and *Abdullahi* clearly establish that Skatrud had a duty to intervene under the circumstances of this case. So Voegeli is entitled to summary judgment against Skatrud on the issue of liability, and this claim will proceed to trial on the issue of damages.

Skatrud cites *Brown v. Jachowicz*, No. 15-cv-237-pp, 2017 WL 3835304 (E.D. Wis. Aug. 31, 2017), and *Lewis v. Stires*, No. 116CV03316TWPDLP, 2018 WL 2136355 (S.D. Ind. May 9, 2018), to show that the law wasn't clearly established. But neither case undermines the principles espoused in *Yang* and *Abdullahi*. In fact, neither *Brown* nor *Lewis* is about an officer's failure to stop another officer from violating a suspect's rights. Rather, both cases hold that a blood draw ordered by a doctor for medical purposes doesn't violate the Fourth Amendment. *See Brown*, 2017 WL 3835304, at *8; *Lewis*, 2018 WL 2136355, at *6. The blood draw in this case was ordered by Lemery for law enforcement purposes, so *Brown* and *Lewis* aren't instructive.

## C. James Schuler, Jaysen Cleasby, Daniel Banks, Christopher Simon, and Erin Wilson

These defendants are all Rock County correctional officers who were involved in restraining Voegeli before the blood draw. Voegeli contends that all of them can be held liable for failing to intervene.

Like Lemery and Skatrud, these officers had reason to know that Voegeli didn't consent to the blood draw. But unlike Lemery and Skatrud, the other officers did *not* know that there were no lawful bases for compelling the blood draw, such as a warrant or exigent circumstances. Or at least Voegeli hasn't adduced evidence that they had such knowledge. Specifically, Voegeli

hasn't adduced evidence that any of these officers knew why his blood was being drawn, that the Janesville police officers didn't have a warrant, or that there weren't exigent circumstances justifying a warrantless, nonconsensual blood draw. In fact, Voegeli cites the incident report of one of the officers, who wrote that he believed the blood draw was based on exigent circumstances. Dkt. 32-1, at 6.

The duty to intervene applies not only when the defendant has actual knowledge of a constitutional violation, but also when he or she has "reason to know" of a violation. *Yang*, 37 F.3d at 285. The parties don't cite any cases in which courts have elaborated on what "reason to know" means in this context, but the court isn't persuaded that it imposes a duty to investigate on the officer. Public officials are generally entitled to rely on the judgment of others who have better access to the relevant information, in the absence of evidence that their judgment is flawed.[3]

The court concludes that the correctional officers were entitled to assume that the police officers were acting with lawful authority, in the absence of evidence to the contrary. Voegeli doesn't point to evidence tending to show that the correctional officers had reason to question Lemery's judgment. It is Voegeli's burden to prove his claim, not the defendants' burden to disprove it, *see Marion v. Radtke*, 641 F.3d 874, 876–77 (7th Cir. 2011), so those officers are entitled to summary judgment. Even if the failure-to-intervene doctrine could be construed to

---

[3] *See, e.g., Connick v. Thompson*, 563 U.S. 51, 67 (2011) ("A district attorney is entitled to rely on prosecutors' professional training and ethical obligations in the absence of specific reason, such as a pattern of violations, to believe that those tools are insufficient to prevent future constitutional violations."); *United States v. Leon*, 468 U.S. 897 (1984) (exclusionary rule doesn't apply when officer reasonably relied on a warrant that later turned out to be invalid); *Smego v. Mitchell*, 723 F.3d 752, 758 (7th Cir. 2013) ("Doctors may rely on the representations of their colleagues absent clear evidence that those representations are known to be false.").

include a duty to investigate, Voegli hasn't shown that such a duty is clearly established, which means that the correctional officers would be entitled to qualified immunity.

### D. Shawn Welte

Like Lemery, Welte is an officer for the Janesville Police Department. He was present when Lemery initially obtained Voegeli's consent for the blood draw, but he later left the jail and wasn't present when Voegeli withdrew his consent or when the nurse conducted the blood draw.

Voegeli's asserted basis for liability against Welte isn't clear. Welte neither ordered the blood draw nor had a realistic opportunity to intervene after Voegeli withdraw consent. Voegeli's position appears to be that Welte is at fault because he "unreasonably concluded" before he left the jail that there were exigent circumstances justifying a blood draw even without Voegeli's consent. Dkt. 52, at 6. But Voegeli cites no authority for the view that an officer can be held liable for reaching an unreasonable conclusion that isn't paired with unconstitutional action.

Every constitutional claim for damages requires a showing that the defendant was personally involved in the violation of the plaintiff's rights. *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 614–15 (7th Cir. 2002). A defendant "may satisfy the personal responsibility requirement . . . if the conduct causing the constitutional deprivation occurs at the official's direction or with his or her knowledge and consent." *Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019). Voegeli hasn't adduced that Welte directed Lemery to conduct a blood draw without Voegeli's consent. And Welte wasn't present during the blood draw, so he didn't have knowledge that Voegeli had withdrawn his consent. Under these circumstances, no reasonable jury could find that Welte was personally involved in the constitutional violation.

The court will grant defendants' motion for summary judgment on Voegeli's claim against Welte.

ORDER

IT IS ORDERED that:

1. Plaintiff Pharon J. Voegeli's motion for partial summary judgment on his claims against defendants Vincent Lemery and Kevin Skatrud, Dkt. 45, is GRANTED.

2. Defendants' motions for summary judgment, Dkt. 25 and Dkt. 36, are DENIED on Voegeli's claims against Lemery and Skatrud. The motions are GRANTED on Voegeli's claims against James Schuler, Jaysen Cleasby, Daniel Banks, Christopher Simon, Erin Wilson, and Shawn Welte, and those defendants are DISMISSED with prejudice.

3. In the absence of a settlement, the case will proceed to trial on damages on Voegeli's claims against Lemery and Skatrud.

Entered October 1, 2021.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge